966 F.2d 220
 22 Fed.R.Serv.3d 967
 Francis N. MARROCCO, Individually, and as Father and Next
Friend of Francis A. Marrocco and Stefani
Marrocco, minors, Donna Marrocco, and
Madlaine Marrocco, Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee.
John E. JONES and Janice Jones, Plaintiffs-Appellees,
v.
GOODYEAR TIRE AND RUBBER COMPANY, Defendant-Appellant.
 Nos. 91-3045, 91-3083.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 9, 1992.
Decided June 12, 1992.
As Amended July 7, 1992.
 
 Robert J. Trizna, Robert J. Lepri, Daniel L. Collins, Trizna & Lepri, Daniel J. Fumagalli, Fumagalli & Tecson, Chicago, Ill., Thomas A. Ricca, Scott F. Bergo, Detroit, Mich., for plaintiffs-appellants.
 Thomas D. Nissen, Paul R. O'Malley, O'Malley & O'Malley, Chicago, Ill., Glenn F. Ruud, Ruud, Scovil & Neppl, Rock Island, Ill., for plaintiffs-appellees.
 William E. Kelly, Michael H. West, Edmund W. Sinnott, Stephen M. Naughton, Pope, Ballard, Shepard & Fowle, Chicago, Ill., Peter H. Lousberg, Lousberg, Kopp & Bonnett, Rock Island, Ill., for defendant-appellant.
 Hugh C. Griffin, David R. Reed, Diane I. Jennings, and L. Anthony Lehr, Lord, Bissell & Brook, Chicago, Ill., for defendant-appellee General Motors Corp.
 Before FLAUM, EASTERBROOK and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 We have consolidated for decision these two appeals because though they arise from separate cases before different district judges, both involve questions about how severely a judge may sanction a party for violating a pretrial protective order. We affirm the district judge's choice of sanctions in both instances.
 
 I.
 
 2
 Marrocco v. General Motors Corp.
 
 
 3
 In this case, plaintiff Francis N. Marrocco and his family brought this products liability action against General Motors Corporation to recover damages for the injuries they incurred in a 1986 car accident. They alleged that the rear axle of their GM car was defective and broke in the moments just before the collision occurred, thereby causing the driver to lose control; GM responded that the broken axle was a result of the impact, rather than the accident's cause. Consequently, the district court issued a protective order requiring both parties to preserve the condition of the car and its components. The order provided in relevant part:
 
 
 4
 The purpose of this Protective Order is to ensure preservation and safekeeping of the motor vehicle which is the subject of this litigation, while at the same time ensuring that all parties have sufficient access to the vehicle for necessary study and testing and that no parties rights are prejudiced.
 
 
 5
 4. No destructive testing shall be performed upon the vehicle, nor shall any changes, alterations or modifications be made to the vehicle, without further order of this court.
 
 
 6
 Both parties proceeded to conduct their pretrial examinations of the vehicle within the parameters of this order--always in each other's presence, and always with prior notice.
 
 
 7
 Until one Saturday morning in September of 1988. It was then that the plaintiffs arranged a "private" viewing of the vehicle for their three case experts. Of course, without the GM experts looking on, the plaintiffs' experts would be free to inspect the car however they pleased. Unfortunately, they went too far: when the left rear axle bearing assembly was removed to determine whether there were any impact marks inside it, the metal cage which held the axle's thirteen individual roller bearings was accidently deformed. As a result, all of the rollers fell out and their sequence within the bearing assembly was irretrievably lost. This meant that any pattern of impact marks on the rollers--a pattern which could have indicated whether the axle broke before or after the accident--was likewise destroyed.
 
 
 8
 GM only learned about this ex parte inspection a month later, when one of the plaintiffs' experts unintentionally referred to it during a deposition. GM immediately moved to dismiss the plaintiffs' complaint for violation of the protective order. After holding an evidentiary hearing on GM's motion, Judge Plunkett found that the plaintiffs had wilfully violated the protective order; that the destructive inspection had deprived GM of evidence which was material to its defense; and that plaintiffs' counsel had also "attempted to suborn perjury and to conceal the violation of a court order." The judge accordingly sanctioned the plaintiffs by granting GM's motion to dismiss, and by ordering plaintiffs' attorneys to pay all of GM's legal fees and costs associated with its motion. In addition, a copy of the court's opinion was submitted to the Michigan state bar--where the plaintiffs' attorneys were admitted to practicewith a request that a disciplinary investigation be commenced.
 
 
 9
 In response, the plaintiffs filed a motion for relief from the dismissal order on the grounds that the district judge's choice of sanctions was unduly harsh in light of the circumstances of the case; that motion was in turn referred to a magistrate judge for a report and recommendation. The plaintiffs then filed a second motion, asking the district judge to permit the magistrate to consider a new "alternative" to dismissal--that GM be required to reconstruct the bearing assembly to the best of its ability, and proceed to defend the case using the manufactured evidence. The magistrate judge was given authority to review the plaintiffs' proposal, but ultimately rejected it as too speculative to support any "honest" expert testimony by GM's witnesses. The magistrate judge also determined that the district judge's dismissal order was justified given the plaintiffs' flagrant disregard of the protective order, and their attorneys' subsequent attempts to cover up the violation. These findings were each adopted by the district judge, and so the plaintiffs' motion for relief from the dismissal order was denied. The plaintiffs appeal solely from this denial.*
 
 
 10
 Jones v. Goodyear Tire and Rubber Co.
 
 
 11
 Here we have the flipside of Marrocco--a defendant who violated a pretrial protective order. In this products liability action, plaintiffs John and Janice Jones sought damages for personal injuries John suffered when a multipiece truck rim separated; named as defendants were the Firestone Tire and Rubber Company, the manufacturer of the rim base, and the Goodyear Tire and Rubber Company, the manufacturer of the side ring which actually struck John Jones and caused his injuries. On May 16, 1986, the plaintiffs and Goodyear stipulated to a protective order which gave Goodyear forty-five days to inspect the rim base and side ring, provided it "preserve, keep safe and maintain" their condition. Both items were then shipped to Goodyear's main headquarter in Akron, Ohio via the United Parcel Service.
 
 
 12
 The rim base arrived in Akron on May 27, 1986, but the side ring never got there. Goodyear should have expected trouble given the way the items were packaged. The side ring was never boxed, though a box could have been purchased from UPS for all of $2.50. It was simply taped to the top of the rim base and tagged with its destination. Goodyear only compounded its problems by waiting nearly three months after receipt of the rim base before initiating an internal trace through the UPS, or even informing the plaintiffs that the ring was missing so they could conduct their own search. By the time UPS was actually contacted, it was already too late; the ring was deemed to have been destroyed in the UPS national overgoods center in Atlanta, Georgia--a shipping graveyard where unclaimed items are eventually discarded.
 
 
 13
 It was not until four years later on March 23, 1990 that the plaintiffs first filed their motion for sanctions. Following a lengthy evidentiary hearing, Judge Mihm concluded that Goodyear had violated the protective order by reason of its own gross negligence. 137 F.R.D. 657. In reaching this holding, the court cited numerous illustrations of Goodyear's lack of care in handling the side ring, including: its failure to adequately package and label the side ring; its failure to timely monitor the UPS shipment and delivery to Akron; its failure to commence a timely trace through UPS; and its failure to timely notify plaintiffs' counsel of the missing side ring before it was too late for them to initiate their own investigation for the side ring. The court went on to state that the "side ring was material and irreplaceable evidence necessary to establish Plaintiffs' theories of a manufacturing defect or deviation from design specification." Accordingly, a directed verdict was entered in favor of the plaintiffs and against Goodyear on the claim for liability based on negligent manufacturing. Goodyear alone was sanctioned, and Goodyear alone now appeals.
 
 II.
 
 14
 We cannot understate the difficulty of the task litigants face when challenging a district court's choice of sanctions. They must convince us that the district court abused its discretion in sanctioning them--a burden which is met only when it is clear that no reasonable person would agree the trial court's assessment of what sanctions are appropriate. Pyramid Energy, Ltd. v. Heyl and Patterson, Inc., 869 F.2d 1058, 1061 (7th Cir.1989); 3 Penny Theater Corp. v. Plitt Theatres, Inc., 812 F.2d 337, 339 (7th Cir.1987); Zaddack v. A.B. Dick Co., 773 F.2d 147, 150 (7th Cir.1985); Locascio v. Teletype Corp., 694 F.2d 497, 499 (7th Cir.1982), cert. denied, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 808 (1983). Most are unable to meet so demanding a standard, and today's appellants are no exception.
 
 
 15
 Given the record before us, it would be hard to imagine plaintiffs more deserving of civil sanctions than the Marroccos. The conduct of their experts and attorneys clearly transgressed the court's protective order: they arranged for Francis Marrocco to have the yard where his car was kept opened during the weekend--when it would otherwise be closed--so that the experts could conduct their private inspection; the plaintiffs' experts proceeded to perform testing which proved to be destructive; and rather than telling GM about this misconduct, the plaintiffs' attorneys attempted to cover it up by asking the experts to later testify that they removed the rear axle bearing at an earlier inspection when GM was present. Yet, according to the plaintiffs, they were punished too severely because (1) the district judge should have required GM to reconstruct the roller bearing sequence before dismissing the case outright, and (2) the loss of the sequence was not prejudicial to GM in any event since its experts failed to establish "how [the missing evidence] would prove that the fracture could only result from frontal impact of the collision." We find both arguments unpersuasive.
 
 
 16
 Judge Plunkett could scarcely be deemed unreasonable for concurring in the magistrate judge's rejection of the plaintiffs' "alternative" to dismissal. Forcing GM to devote its own time and resources to make amends for the plaintiffs' wrongdoing would in all likelihood prove futile, not to mention grossly unfair. To begin with, the thirteen roller bearings could be reassembled in billions of different configurations if no consideration were given to their individual impact markings. And even assuming some sequences could be eliminated based on these markings, there would still be no way of knowing for certain whether or not GM reconstructed the roller bearing sequence correctly--a point which the plaintiffs' experts themselves conceded. Either way, GM's experts would have to work blindly, making assumptions about the nature, direction and degree of forces which were exerted on the axle shaft when it fractured. And, as the magistrate judge pointed out, that would render any testimony about the rollers pure speculation.
 
 
 17
 We find it ironic that the plaintiffs also contend that GM has not adequately explained what an intact bearing assembly would have shown, for it was the plaintiffs' own misconduct which prevented GM from acquiring that very information. Perhaps that evidence was an irreplaceable part of GM's defense, as their expert witnesses asserted during the evidentiary hearing. Then again, perhaps not. But therein lies the prejudice--GM was denied any opportunity to find out one way or the other. And since there is no longer any evidence which disproves either party's evaluation of how material the roller sequence really was, we must defer to the district judge's finding on that issue. See Zaddack, 773 F.2d at 150-51 (district court may make findings of fact in ruling on a motion to dismiss as a sanction, and its findings will not be disturbed unless they are clearly erroneous); Fed.R.Civ.P. 52(a).
 
 
 18
 To be sure, a district court's discretion in sanctioning litigants is not unfettered--particularly where the draconian sanction of dismissal is imposed. Godlove v. Bamberger, 903 F.2d 1145, 1148 (7th Cir.1990); Schilling v. Walworth County Park & Planning Comm'n, 805 F.2d 272, 275 (7th Cir.1986). Indeed, we have pointed out on several occasions "[a] dismissal with prejudice is a harsh sanction which should usually be employed only in extreme situations, where there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailable." Pyramid Energy, 869 F.2d at 1061 (quoting Webber v. Eye Corp., 721 F.2d 1067, 1069 (7th Cir.1983) (emphasis added)). However, in our view the plaintiffs' wilful and unexcused violations of the protective order here certainly qualify as "contumacious conduct." We therefore hold that the district court did not abuse its discretion in sanctioning the plaintiffs with the dismissal of their complaint.
 
 
 19
 So we turn to Goodyear's claim, which fares little better. Goodyear raises three contentions to prove that the district court abused its discretion in entering sanctions against them: (1) the plaintiffs failed to establish any evidence of Goodyear's bad faith; (2) the plaintiffs failed to show that they were prejudiced by the loss of the side ring; and (3) the district court failed to fashion a lesser sanction which would adequately protect the interests of the plaintiff while permitting Goodyear an opportunity to present its defense. For the most part, these contentions echo those made by the Marroccos--and they suffer from the same underlying flaws.
 
 
 20
 Goodyear's first contention--that the plaintiffs failed to prove it acted in bad faith--rests on the premise that only a showing of intent to violate the protective order will support the imposition of sanctions. Here, asserts Goodyear, the loss of the side ring was accidental, not deliberate. By Goodyear's account, the employee responsible for packaging the side ring was unfamiliar with the special requirements for shipping such odd size items, and simply assumed that the packing job was adequate since the UPS driver accepted the side ring without comment. And while Goodyear concedes that there may have been some carelessness in the packaging and subsequent search for the side ring, it contends that this level of culpability doesn't rise to the level necessary to justify entering any sanctions against it. We disagree.
 
 
 21
 There is no legal basis for Goodyear's claim that sanctions should be limited solely to situations where the non-compliance is wilful or deliberate. Quite to the contrary, the Supreme Court has expressly stated that sanctions may be appropriate in any one of three instances--where the noncomplying party acted either with wilfulness, bad faith or fault. National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976) (per curiam) (emphasis added); see also Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095, 2 L.Ed.2d 1255 (1958). These three measures of culpability are each wholly distinct from one another. "Bad faith," for instance, is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order. "Fault," by contrast, doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct--or lack thereof--which eventually culminated in the violation.
 
 
 22
 Goodyear's conduct readily falls within the classification of "fault." It reflected extraordinarily poor judgment in the way it packaged, labeled and handled the rim base and side ring. Equally inexcusable is the uncontested finding that Goodyear stood idly for months before it attempted to investigate the side ring's apparent loss; it waited even longer before informing the plaintiffs that the side ring was missing. These omissions cannot be characterized merely as a mistake or carelessness. Rather, they reflect gross negligence on the part of Goodyear--a flagrant disregard of its assumed duty, under the protective order, to preserve and monitor the condition of evidence which could be pivotal in a lawsuit. Such being the case, the district court reasonably concluded that Goodyear's misconduct was punishable with a directed verdict in favor of the plaintiffs.
 
 
 23
 Nor do we find any grounds for disturbing the district court's finding that the loss of the side ring prejudiced the plaintiffs. A physical examination was necessary in order to assess precisely what roles the rim base and side ring may have played in causing their explosive separation. Moreover, experts for both sides agreed that the inability to physically examine the side ring precluded the evaluation of several possible manufacturing defects, including: metallurgical deficiencies; metal cracks, distortions, degree and depth of corrosion or metal fatigue; and noncompliance with Goodyear's design specifications and standards. In short, the loss of the side ring prevented the plaintiffs from establishing a prima facie case on the theory of negligent manufacturing, thereby leaving their only hopes of success in proving that the ring was inherently flawed in design. What more need be shown to demonstrate prejudice?
 
 
 24
 To this Goodyear retorts that the side ring could not have been that material to the plaintiffs' case, since they didn't move for sanctions until more than three and one-half years after its loss. However, this contention only seems appealing by virtue of hindsight. The plaintiffs had originally sought recovery under the theory of design defect, and thus the side ring did not necessarily have to be produced; it was only later that they realized that a manufacturing defect was an alternate theory under which they might prevail. And while it is true that the plaintiffs could have been more diligent in pursuing a case based on this alternate theory, their delay does not translate into a per se conclusion that the side ring was immaterial to their case. Such an inference is reasonable, but so was the district court's finding to the contrary--and it is that finding to which we must defer.
 
 
 25
 Finally, we find no error in the district court's conclusion that lesser sanctions would be inadequate under these circumstances. Goodyear claims that the court could have fashioned other "more reasonable" sanctions, including the award of attorney's fees, the use of an adverse inference instruction or specific-issue related sanctions. But whether or not these alternatives are viable--or even more just than the sanctions actually imposed--is entirely irrelevant. We review the district court's imposition of sanctions only for abuse of discretion, and given the nature of Goodyear's negligence in this case, we cannot say that the court acted unreasonably in granting a directed verdict in favor of the plaintiffs. Quite simply, sanctions can be employed for a wide array of purposes, but they cannot replace lost evidence.
 
 III.
 
 26
 Accordingly, we AFFIRM the sanctions imposed by the district courts in both the above cases.
 
 
 
 *
 Shortly after General Motors moved to dismiss the complaint plaintiffs discharged their original attorneys and engaged new counsel to represent them. All references to plaintiffs' attorneys or counsel in the text of this opinion are to plaintiffs' original counsel and not counsel on appeal