**In re KMART CORPORATION, et al., Debtors.**

**No. 02 B 02474.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

July 31, 2007.

Bryan A. Walters, Richard A. Samdal, Brion B. Doyle, Varnum Riddering Schmidt & Howlett LLP, Grand Rapids, MI, David A. Newby, Johnson & Newby, LLC, Chicago, IL, for Global Property Services.

William J. Barrett, Wendi E. Sloane, George R. Mesires, Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLP, Chicago, IL, for Kmart Corporation.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter is before the court on "Creditor Global Property Services, Inc.'s Motion for Sanctions for Spoliation and Violation of the Court's July 11, 2005 Order and Motion to Compel Discovery," and Kmart's response thereto. The court has conducted a trial on the issues raised in connection herewith and now enters its findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### Background.

On January 22, 2002, Kmart Corporation and thirty-seven of its subsidiaries and affiliates filed voluntary Chapter 11 petitions in this court. Kmart continued to operate as debtor in possession thereafter. On or about April 23, 2003, the court entered an order confirming the plan of reorganization, as modified. Shortly after the effective date of the plan, notice was given that administrative claims had to be filed by June 20, 2003.

On June 19, 2003, Global Property Services, Inc. ("Global") filed an administrative claim, no. 53441, for amounts owed on post-petition invoices. On the same date, Global filed a second administrative claim, no. 53442, claiming unliquidated damages for breach of contract and tortious misconduct. Global filed a third claim, no. 56747, on September 9, 2003, which amends claim no. 53441.

An objection to these claims was filed by Kmart on February 2, 2004, as part of its Nineteenth Omnibus Objection to Claims. The Nineteenth Omnibus Objection included approximately 6,300 objections to

claims by Kmart. Global filed its response to the Nineteenth Omnibus Objection on March 5, 2004.

On February 14, 2005, Global served its First Set of Interrogatories, First Set of Requests for Production of Documents, and First Set of Requests for Admissions. Over two months later, on April 26, 2005, Kmart produced 66 pages of documents.

Global's attorneys wrote to counsel for Kmart on May 2, 2005, requesting assurances that Kmart was preserving evidence in its possession, that the balance of Kmart's responsive documents would be produced by May 6, 2005, and that Kmart had not destroyed any relevant evidence or evidence that might lead to the discovery of admissible evidence.

The parties ultimately entered into a stipulation regarding the discovery to be produced to Global, and the court entered the stipulation, compelling Kmart to produce discovery. Specifically, under the July 11, 2005 "Stipulation and Order Compelling Discovery" (the "July 11 Order"), Kmart stipulated to make all responsive documents, including electronic mail, that were located at its corporate headquarters available for review and copying by July 8, 2005. Kmart further stipulated to make all responsive documents that were located at its individual stores available for review and copying by July 31, 2005. In a letter dated July 11, 2005, Kmart's counsel represented to Global that it had produced the responsive documents located at Kmart's headquarters in Troy, Michigan.

The parties have stipulated that as of August 18, 2005, over a month after the deadline set in the July 11 Order, Kmart had produced only 2,614 pages of documents from its corporate headquarters. Thereafter, on September 9, 2005, Kmart produced from its headquarters 287 pages of additional documents. Kmart produced more documents at the deposition of Kenneth Pocius, Kmart's senior commercial attorney, on November 3, 2005. It also produced 12 pages of e-mails at the November 10, 2005 deposition of Kmart employee William Ellis.

On January 19, 2006, Kmart produced 83 pages of documents from headquarters relating to procedures for e-mail access at the store level and communications from Kmart headquarters to Kmart stores regarding national contract protocols. Two weeks later, on February 2, 2006, Kmart produced over 5,600 pages of documents from its corporate headquarters.

Thereafter, at the February 17, 2006 deposition of Kmart employee William Simmons, Kmart for the first time produced two documents from Simmons' file. On February 21, 2006, five days after the deposition of Kmart employee Lily Petrovic, Kmart produced over 200 pages from Petrovic's file. The parties dispute whether all of these documents had been previously produced by Kmart, and Global concedes that approximately 110 pages were included in prior productions. Petrovic testified at her deposition that she had previously turned over to Kmart's counsel all of her documents relating to Global. The parties have stipulated that as of March 3, 2006, almost eight months after the July 11 Order, Kmart was still in the process of reviewing its electronic files, including e-mail from current and former Kmart employees.

On March 7, 2006, Global filed the instant motion for sanctions for spoliation and for violation of the July 11 Order and to compel discovery of certain personnel files. Thereafter, on March 13, 2006, Kmart produced 464 pages of documents, as discussed further below, consisting of e-mails and attachments from the electronic files of its current and former employees. And on March 30, 2006, Kmart produced

101 documents from the electronic files of Mike Peters, a current Kmart employee. All told, Kmart has produced over 20,000 pages of documents. (April 25, 2006 Transcript ("Tr.1"), at 90; *see also* Kmart's Proposed Findings of Fact ¶'s 36 and 81).

The instant dispute centers largely on claim no. 53442, and discovery relevant thereto. On the face of the claim, in the section titled "Basis for Claim," Global specifies "Breach of Contract, Tortious Interference, and Defamation by DIP," i.e., by Kmart as debtor in possession. In the sections titled "Total Amount of Administrative Claim" and "Brief Description of Claim," Global refers to attached Exhibits A and B, respectively. Exhibit A, titled "Damages," states:

> Damages are not capable of precise calculation at this time. Damages may exceed $1,000,000 per year for an undetermined number of years, representing [Global's] lost profits. Additionally, [Global] may have economic claims for unjust enrichment, as well as, claims for punitive damages stemming from various torts (i.e., tortious interference and defamation per se) under various state laws.

In Exhibit B, titled "Description of Claim," Global alleges that it had "reached an agreement" with Kmart "whereby [Global] would act as the general contractor for all of the white and green services (i.e., landscaping, parking lot sweeping and snow removal) for Kmart stores nationwide." Global states that the agreement was not formalized in a single document, but that each store team director/manager was given authority to contract with Global directly and was encouraged to do so via a memo circulated on January 23, 2002, i.e., the day after the Chapter 11 petitions were filed. Global alleges that Kmart acknowledged in the memo that Global was able to save

Kmart substantial sums of money with respect to its white and green services.

Further, Global states in Exhibit B that since it was acting as general contractor, it contracted directly with subcontractors for the services provided to Kmart and that one of the key features of Global's contracts with its subcontractors was a non-compete provision, preventing subcontractors from entering into white and green service contracts directly with Kmart for a period of one year following termination of the subcontract.

Global then goes on to allege that in the early spring of 2003, Global received a request from Kmart for permission to audit Global's books, specifically requesting access to all of Global's subcontractor information, including names, addresses, and terms of the subcontracts. According to Global, Kmart wanted to review the subcontracts and "wanted to be able to determine the margins that [Global] was receiving over and above what the subcontractors were charging [Global]," Global states that it agreed to provide the information, conditioned on execution of an Audit Disclosure and Confidentiality Acknowledgement (the "Audit Agreement"), which was signed by Kmart employee William Ellis on March 20, 2003 and provided that Kmart would not contract, directly or indirectly, or otherwise interfere with Global's subcontractors.

Finally, Global alleges in Exhibit B that in the weeks following the audit, Global learned that Kmart was contacting the subcontractors directly and demanding that the white and green services continue under the same terms negotiated with Global, but that the subcontractors bill Kmart directly. Global concludes its description of the claim by stating:

> Post-petition, Kmart has breached the Audit Agreement and tortiously interfered with the contracts between [Glob-

al] and the subcontract[or]s. Kmart has also defamed [Global] by making false statements to third parties regarding [Global's] business and ethics. These post-petition actions give rise to damages resulting from the intentional and negligent acts of the debtor-in-possession, and thus, are actual and necessary expenses of the bankruptcy estate and are entitled to administrative expense status.

Global attaches to Exhibit B a copy of the January 23, 2002 memo referred to above, a copy of its form subcontract, and a copy of the Audit Agreement.

On or about August 18, 2005, Kmart tiled a motion seeking an order requiring the parties to submit further pleadings spelling out the claims and objections involved in this contested matter, either in complaint and answer form, as contemplated by Bankruptcy Rules 7008 and 7012 (incorporating Fed.R.Civ.P. 8 and 12, respectively) or in a joint pretrial statement. Noting that the parties had commenced extensive discovery and that Global had provided Kmart with a supplemental statement of its claims, Kmart stated: "This is not a garden-variety contested matter over a claim objection. Although two of [Global's] three claims are for unpaid invoices and therefore fairly straightforward, the third claim, an administrative claim asserting breach of contract and various torts and claiming damages of more than $25 million (making it among the largest administrative claim in the case), includes at least nine legal theories and will involve a multitude of facts." Kmart suggested that requiring further pleadings would define and ultimately reduce the disputed issues in this matter.

On October 31, 2005, Kmart's motion to require further pleadings was withdrawn as moot, Global having filed its "Statement of Claims" on September 23, 2005. In that statement, Global set forth its claims in complaint format, containing six separate counts, including breach of contract, promissory estoppel, unjust enrichment, defamation, misappropriation of trade secrets, and tortious interference with contracts, business relationships, and business expectancies.

Again, Global filed the instant motion on March 7, 2006, seeking sanctions based upon Kmart's alleged spoliation of evidence and violation of the July 11 Order.[1] Global complained that for months after submitting its first document production request on February 14, 2005, Global struggled to obtain any responsive documents from Kmart. Global further complained that despite entry of the July 11 Order, Kmart was still refusing to honor its discovery obligations over a year after the submission of the document request. Global alleged, *inter alia,* that Kmart had only recently begun reviewing the electronic files of its former employees and that Kmart's document retention/destruction policy had resulted in the systematic destruction of electronic information.

Kmart filed a response to the motion, noting, *inter alia,* that there was no contention Kmart had destroyed documents intentionally or in bad faith and that Global had failed to identify any "trigger date" for Kmart's duty to preserve evidence. Kmart urged that it did not reasonably anticipate litigation with Global (and therefore had no duty to preserve evidence) until shortly before the filing of the Nineteenth Omnibus Objection on February 2, 2004, that any automatic deletion of documents under Kmart's document retention/destruction policy would have oc-

---

1. As indicated above, the motion also sought an order compelling the production of certain personnel files. However, that portion of the motion has previously been resolved.

curred prior thereto, and that Global could not, in any event, establish prejudice or that specific relevant documents had been destroyed.

Global filed a reply brief, and the court initially set an evidentiary hearing on Global's motion for April 12, 2006. At the April 12 hearing, however, Global requested a continuance, as it had misunderstood the nature of the hearing, believing it had been set for oral argument rather than presentation of evidence. The court granted Global's request and rescheduled the trial on Global's motion for April 25 and 26, 2006. The parties filed a joint pretrial statement, in which they stipulated to many of the facts recited above. They also stipulated that Kmart had identified forty-three individuals with knowledge of Global's claims and Kmart's defenses to those claims, including seventeen former employees. Several of Kmart's employees testified at the hearing, including two individuals from Kmart's information technology department ("IT"). In addition, portions of the deposition testimony of other employees were read into the record.

According to witness Stephen Burke, a systems manager in IT, there were approximately five e-mail servers at Kmart in 2002, serving approximately 10,000—12,000 employees. Kmart used a Microsoft e-mail program called Exchanges and it uses the same product today, though in more current versions. Burke testified that there were at the time several places that an employee could store e-mails and their attachments. First, an employee could store e-mails on the e-mail server itself, in the employee's "mailbox." Second, be could store e-mails on the H-drive, another server provided by Kmart that allows an employee to store data outside the employee's local desktop. Third, an employee could store e-mails and their at-tachments on his local desktop, i.e., on the C-drive (or "hard drive") of his computer. Finally, an e-mail could be stored on anything it could be written to, e.g., a diskette or CD.

With respect to the Microsoft Exchange mailbox, Burke testified that many of the "folders" therein, e.g., "Inbox," "Sent Items," and "Deleted Items," are automatically provided as part of the Exchange program. Employees can, however, create folders within the mailbox for storing particular e-mails, and these folders are referred to as "user-defined" folders.

The parties stipulated to admission of Exhibit 9, which includes Kmart's record retention policy with respect to e-mail. The e-mail retention section states, *inter alia:*

> To ensure high performance email support, standard retention periods have been established for each type of email folder:
>
> - **Inbox folder:** read or unread messages will be deleted **90** days after 'date sent.'
> - **User defined folders:** read or unread messages will be deleted **180** days from 'date sent.'
> - **Sent Items Folder:** messages will be deleted **30** days after 'date sent.'
> - **Deleted Items Folder:** messages will be deleted when you shut-down your PC.

Burke testified that the "date sent" is typically the date that an e-mail is received into the employee's mailbox. In applying the automatic deletion feature, however, he explained that the date from which the retention period runs can change if the "date last modified" (one of the types of stored information that are referred to as "metadata") for that e-mail changes. For example, if an employee moves an e-mail from his inbox to a user-defined folder, the

"date last modified" would change, and the retention period would run from the date it was so moved.

Burke explained that once an e-mail reached the end of the slated retention period, it would be moved into the "deleted items" folder. It would then be deleted from the deleted items folder the next day. At that point, the e-mail would go into an area on the e-mail server and remain there for an additional two weeks. At the end of that two-week period, the e-mail would be removed from the container on the e-mail server. It would then be recoverable only from a backup tape.

Employees did have the means to move data out of the mailbox and store it for extended periods of time on their H-drives and C-drives. According to Burke, employees

> ... [could] put data or e-mail into a personal folder. And you'll see how the word PST is referred to as personal folders, or personal stored files. These can reside on the (H:) drive or they can reside on ... the local hard drive, the [employee's] desktop.

(April 26, 2007 Transcript ("Tr.II"), at 44). Burke testified that there were no limitations on the types of information that could be stored on the H-drive or the C-drive, which could accommodate e-mail, Word documents, Excel spreadsheets, and more.

Again, the personal stored files on the H-drive and C-drive constituted a type of personal archive, where, *inter alia,* e-mails and their attachments could be saved for extended periods. Unlike the employee's mailbox folders, there was no "automatic deletion" feature with regard to information on the H-drive or C-drive.

Todd Eschtruth, however, another systems manager at Kmart, explained that the asset management team was responsible, *inter alia,* for "cleansing" the C-drives of terminated employees. Under this un-

written procedure, the team would, upon notification from the human resource department that an employee had been terminated, collect the employee's computer system, e.g., his desktop or laptop, and store it for two weeks in a secured room referred to as the "asset cage." At the end of that period, the hard drive would be cleansed, using the "boot and nuke" program, According to Eschtruth, the boot and nuke program is an open source utility on the internet "that is designed to erase a hard drive, even to the levels of what they call a DOD, Department of Defense, erase. It's basically to make the data unrecoverable on the hard drive." (Tr. II, at 9) The computer would then be returned to inventory so that it could be redeployed. This unwritten procedure for cleansing a terminated employee's C-drive went into effect in early 2002, when the boot and nuke tool was first implemented.

Eschtruth testified that there is an exception to this cleansing procedure for individuals who are considered on "legal hold." When asked how long the "legal hold" concept had been around in this regard, Eschtruth stated: "The concept or the term legal hold that I have been familiar with has been around since September of 2005, when T took responsibility for the Sears environment, I guess, during the transition" (i.e., after the 2005 merger between Kmart and Sears). (Tr. II, at 10), He further testified that the current procedure calls for his group to check against a database maintained by Kmart's legal department to determine whether or not a particular piece of computer equipment needs to be preserved. Under the current procedure, if a computer is listed on the database as one that needs to be preserved, Eschtruth's team stores it in a locked room until further notice.

As for Kmart's backup system, Burke testified that there was no backup for the

C-drives. There was, however, backup for the Exchange mailboxes; the e-mail servers were backed up onto tapes on a nightly basis. The purpose of the backup was to ensure that data could be recovered in the event of damage to or malfunction of the primary storage device, i.e., for disaster recovery. Each server was backed up as a unit; the e-mail of a particular employee could not be restored individually. Accordingly, if one individual's e-mail had to be recovered, the entire server would have to be restored. Such a restoration could take from two to five days.

In 2002, Kmart used 96 tapes to perform the back-up of e-mail servers, and those tapes were reused on essentially a 28–day cycle. Once a tape was recycled, the information on it was overwritten. The only change in e-mail backup since 2002 is the tape device and software product used; the purpose of the backup remains the same, i.e., disaster recovery, and the schedule is essentially unchanged.

The H-drive is backed up nightly as well. There is a special tape system for the H-drive, and it employs the same software and hardware as is now used for e-mail server backups. The purpose of the H-drive backup, like that for e-mail servers, is disaster recovery, However, with respect to the H-drive, information for a particular individual can be retrieved without doing a full system restoration.

Again, since there is no "automatic deletion" feature with regard to H-drive information, the information will remain there indefinitely unless an employee deletes it, and Kmart's IT department has the capacity to restrict an employee's ability to delete information from the H-drive. Once information is deleted, it will remain on the backup tape for 90 days, and that retention period has been in effect from 2002 to the present.

Kmart has two additional drives—the P-drive and the W-drive. The P-drive is a public drive. It is a shared repository of data accessible by all Kmart employees. There are millions of files stored on the P-drive, consisting of Word, Excel, and other types of office documents; e-mail cannot be stored on the P-drive.

The W-drive is a working group drive, and it is similar to the P-drive, but more secure. It is designed to allow individuals within a department to share data. For example, the legal department's W-drive would be accessible only by members of that department. As with the P-drive, e-mail cannot be stored on the W-drive. Millions of files are stored on the W-drive—even more than on the P-drive.

There is no "automatic deletion" feature with regard to either P-drive or W-drive information. Accordingly, the information will remain there indefinitely unless an employee deletes it, and Kmart's IT department has the capacity to restrict an employee's ability to delete information from the P-drive and the W-drive. Kmart's counsel stated that she first learned of the existence of the P- and W-drives the day before the evidentiary hearing on Global's motion, when she met with systems manager Stephen Burke in connection with his deposition.

As for the "legal hold" concept, Burke's testimony was similar to Eschtruth's. When asked whether there were any written procedures governing implementation of a litigation hold for electronic data in the year 2000, Burke stated that he was not aware of any. He stated that "[t]hat was something that started when we merged with Sears, and that was their term." (Tr. II at 68). With respect to e-mail in formation, for example, Burke testified that the automatic deletion of e-mail pursuant to Kmart's record retention policy was not suspended until October of

2005, i.e., after the merger. When asked whether the IT department could have suspended the automatic deletion of e-mails in 2002, Burke stated, "We did for certain people when requested." (Tr. II at SO). He stated that IT could have suspended the policy as a whole in 2002; IT had the ability to turn the automatic deletion feature off and on.

Burke further testified that IT had taken steps in the past to preserve electronic data, and one way that they did that was to extract data from an individual's mailbox and place it into a PST file. This process, referred to as taking a "snapshot" of an employee's mailbox, had the effect of preserving any information contained in that mailbox at the time the snapshot was taken.

With respect to the discovery requests served by Global in February of 2005, Kenneth Pocius, Kmart's in-house Senior Attorney who was generally responsible for helping to resolve outstanding bankruptcy claims, oversaw Kmart's efforts to gather and produce responsive information. Pocius testified that Global's discovery request came in to him, and he initially delegated the task of preparing the response and gathering responsive information to Mr. Marshall, a contract attorney at Kmart. Pocius, called as a witness by Global, testified that he reviewed the request briefly and then discussed with Marshall "sort of the appropriate leads as to where to start to put th[e] response together," (Tr. I at 46). When asked by Kmart's counsel which employees Pocius advised Marshall to speak to for the purpose of gathering responsive information, Pocius stated, "It would have been Bill Ellis and Chuck Yoakim." (Tr. I at 76). He further stated that he had no reason to believe that Marshall did not follow his instructions. On examination by Global's counsel, however, Pocius could not recall

with certainty where Marshall looked for electronic information, which employees Marshall may have spoken to, or what he might have said to them. When asked if he took any other steps initially, other than delegating responsibility to Marshall, Pocius replied that he believed he "may have reviewed the discovery response" that was prepared. (Tr. I at 46). Marshall's efforts resulted in the production of only 66 pages of responsive information, produced to Global on April 26, 2005.

After the response was served, Global understandably raised concerns regarding its adequacy. At that juncture, in or about the summer of 2005, Pocius stated that he "took on sort of the point responsibility in house" to respond to the discovery requests. (Tr. I at 47), He could recall with certainty speaking only to employees William Ellis, "Chuck" Yoakim, William Simmons, Lily Petrovic, and Patrick Portman. Pocius did not tell the employees where to look for electronic information (e.g., C-drive, H-drive, or other repositories), but rather left it to them to determine where to search. When asked why he gave no direction as to where to search, he stated, "Because I don't know where any individual employee would keep their specific information." (Tr. I at 78), He claimed that he also did not want to limit their search in any way.

Pocius could not specifically recall having told any employees to refrain from deleting electronic information. He also testified that he was not aware of anyone at Kmart implementing a litigation hold with respect to the Global claims.

Pocius did not approach the IT department to have them search for electronic information until October of 2005. At that time, he gave IT a list of certain former employees and asked that IT provide him with whatever electronic information they had regarding those individuals, including

H-drive information and PST files. As a result, IT provided 1.45 gigabytes of data. While the data included information from the former employees' Exchange mailboxes, it did not include any H-drive information. Pocius did not learn until the week before the evidentiary hearing in this matter that IT had failed to search for H-drive information, as requested.

The 1.45 gigabytes of data that resulted from Pocius' October 2005 request were not reviewed by Kmart's counsel for responsive information until at least February of 2006, and the information found to be responsive was not produced to Global until March 13, 2006, after the filing of the instant motion. One of Kmart's outside counsel, George Mesires, testified that he received from IT a CD containing the 1.45 gigabytes of data in early February 2006. According to Mesires, his law firm purchased search software that allowed him to sort through the 1.45 gigabytes to find potentially responsive information, using search terms such as "Global," "GPS," "white & green services," and so forth. After manually reviewing the potentially responsive information, Mesires identified approximately 456 pages of responsive documentation, which he produced to Global on March 13, 2006 under a cover letter stating that the production included "[s]napshots of PST files and H drives" for certain former employees identified on a screen shot attached to the cover letter. The screen shot, which was received into evidence together with the cover letter as Exhibit 26, depicted the contents of the CD.

Mesires testified that of the forty-three employees Kmart had identified as individuals with knowledge, twenty-five were former employees, and the search performed by IT was limited to the twenty-five former employees. When asked why the search was so limited, Mesires said it was because the current employees were conducting their own searches.

Mesires testified that in late March of 2006, while preparing for the evidentiary hearing in this matter, he learned that his description in the cover letter was not accurate, because (as indicated above) the PST files were not from the former employees' H-drives, but were instead from their Outlook mailboxes. After Mesires discovered that the CD from IT did not include H-drive information, Kmart was asked to determine whether there were any H-drives available for the 25 former employees.

Accordingly, during the week before the evidentiary hearing in this matter, Kmart's IT department conducted a search for H-drive information for the former employees. That search, conducted the week of April 17, 2006, was the first time that IT had searched for the former employees' H-drive information. As a result of that search, H-drive data was located for three of the former employees, i.e., Shawn Husband, Paul Losin, and Mike Pugh. (According to Pocius, Kmart did not implement a policy for archiving H-drive data for departing employees until October of 2005.) At the time of the evidentiary hearing, responsive information from these three H-drives had not yet been produced to Global, as Kmart's outside counsel was still in the process of reviewing the data, using the same software that was purchased for review of the 1.45 gigabytes of mail discussed above.

With respect to the "trigger" date for Kmart's obligation to preserve information relating to Global's claims, Global relies on an e-mail sent by William Ellis, currently Kmart's vice president of store operations. Ellis was previously Kmart's vice president of design construction and facilities maintenance, a position to which he was promoted in October of 2002. Shortly af-

ter Ellis assumed that role, he began to meet with some of the vendors that fell within the facilities maintenance domain, including Global. Ellis could recall two face-to-face meetings with representatives of Global, and Ellis was the highest level Kmart employee participating in those meetings. Indeed, no one at a higher level on Kmart's management chain had dealings with Global.

In March of 2003, in connection with an audit of Global being conducted by employee Shawky Yoakim, Ellis signed the Audit Agreement, which provided that Kmart would not interfere with Global's subcontracts. Thereafter, on May 7, 2003, Ellis received a copy of an e-mail from Global employee Bryan Idzior to Kmart employee Randy Andresen, then Kmart's director of operations, in which Idzior states he has been told that certain Kmart stores were instructed to cancel contracts with Global. Idzior further states, *inter alia:* "Kmart has agreed, in writing, that it shall not interfere with [Global's sub-]contracts. We understand that this matter has been duly communicated to the necessary parties and we trust that Kmart will conduct itself accordingly." (Exhibit 23). Ellis sent an e-mail to Andresen approximately one half-hour later, stating:

> Global is seeing the writing on the wall and realizing that their business with Kmart is slipping away.
>
> The only thing we have to be careful of is not using their sub contractors. As the business melts away on them I am certain they will take legal action.

(Exhibit 23).

When examined about this e-mail, Ellis portrayed his remark concerning the "certainty" of litigation as merely a "feeling" he had—his personal opinion or impression—and explained that he had from "day one" been suspicious of Global's business practices and their intentions. (Tr. I at 101–02), According to Ellis, the e-mail was more of a warning on how to conduct business with Global. Ellis did acknowledge, however, that one specific basis for his "personal opinion" was the fact that Global had expressed a concern about Kmart's stores using Global's subcontractors.

Ellis was also examined as to his efforts to search for electronic information. He testified that he had a number of meetings with representatives from the legal department, including Poems, but he had no recollection when such meetings occurred. At those meetings, he was asked to provide documents, but he was not given any direction as to where to search. He also was given no instructions regarding document preservation; no one told him not to delete or destroy any relevant information.

Ellis nonetheless claims that he preserved and produced everything he had—though he could not remember when the production occurred. He testified that from the time he assumed his position in facilities maintenance, he retained all of his e-mails in his H-drive, so that they would not be deleted. He further stated that he did not store documents anywhere other than on his H-drive, and he searched his H-drive to retrieve anything related to Global. Although he only stores documents on the H-drive, he checked his C-drive for responsive information and found none. He also checked his hard copy files. Ellis stated that he is somewhat computer illiterate and therefore does not know how to use the P-drive or the W-drive and does not store documents there. He stated that he was sure, however, that there are folders in the W-drive that relate to his department.

With respect to its spoliation claim, Global relies in part on extrinsic evidence consisting of e-mails and other documents produced by Timothy Slimp, a former

Kmart employee. The documents produced by Slimp were received in evidence as Exhibits 17 and 18, and although Slimp did not testify at the hearing, designated portions of his deposition testimony were received in evidence as Exhibit 12 and were read into the record.

Some of the Slimp documents were produced in response to an e-mail of a proposed subpoena from Global, and others were subsequently produced in response to a subpoena served by Kmart. All of the documents were produced from the C-drive of an old laptop computer that Slimp had retained in his possession after he was terminated on October 7, 2002. According to Slimp, the C-drive was simply left at his home when the old laptop was replaced with a newer one; he did not advise anyone at Kmart that he still had the old computer.

Slimp testified that the e-mails were on the C-drive of his old laptop because while working at Kmart, he had the ability to work off-line and could access Kmart's e-mail system remotely and download everything onto the laptop. The e-mails contained in Exhibits 17 and 18 range in date from September 5, 2001 to August 22, 2002. To the extent that they also resided on Kmart's e-mail servers, they would have been automatically deleted in the ordinary course under Kmart's document retention policy, well before even May 7, 2003, the date of the Ellis e-mail discussed above. And to the extent Slimp may have had any later e-mails stored on Kmart's e-mail servers at the time of his termination on October 7, 2002, they should have been automatically deleted by approximately April 6, 2003, i.e., 181 days after his termination.[2]

However, notwithstanding the automatic deletion periods set forth in the e-mail retention policy, Kmart was able to recover information from Slimp's Outlook mailbox. Slimp was one of the former employees whose mailbox information was included in the 456 pages of documents produced to Global on March 13, 2006, as shown on the screen shot in Exhibit 26, discussed above.

With respect to the documents in Exhibit 17, produced by Slimp from the C-drive of his old laptop, one is an e-mail sent to Slimp on January 22, 2002 by William Simmons, currently Kmart's regional facilities construction manager. Simmons was formerly Kmart's manager of national programs, and Slimp was his immediate supervisor for that program. In the e-mail, which is Bates–Stamped Slimp 00013, Simmons states, "Attached is the revised frequently called telephone list for the national contractors. I saved a copy to the 'W' drive in National Contracts folder." The attached page, Bates-stamped Slimp 00014, is a page entitled "National Contracts Call List," and it includes Global. Simmons testified that he did in fact save a copy of the call list to the W-drive and that the information on the list was updated from time to time.

Global claims that the National Contracts Call List is highly relevant to its claims, as it lists Global along with Kmart's other national contractors. According to Global, the call list, saved by Simmons to the W-drive, was not included as part of Kmart's production and was first received when produced by Slimp.

Global appears to contend that either Kmart had deleted the National Contracts Call List from the W-drive or, if the list remains on the W-drive, that Kmart has

---

**2.** This assumes that Slimp would have moved discoverable e-mails into a user-defined folder. *See* n. 11, *infra*.

failed to produce it a full twelve months or more after Global's discovery requests. (See, e.g., Tr. I at 176). Global claims that Kmart has breached its discovery obligations by failing to perform any systematic search of the W-drive for responsive information. It makes the same claim with respect to the P-drive.

In response, Kmart relies on testimony by Simmons of a search he performed that included each of those drives. Simmons testified both by way of deposition and in person at the evidentiary hearing.

Designated portions of a deposition given by Simmons on February 17, 2006 were received into evidence as Exhibit 11 and read into the record. At the deposition, Simmons testified that he had reviewed his "datebook" entries for references to Global and had also reviewed paper files in his possession. When asked whether he had looked for any electronic documents, he stated, "I believe I did." (Tr. I at 138). Counsel then asked specifically what Simmons did to search for electronic documents, and Simmons replied, "Just a search of any documents that I stored on my computer." *Id.* Explaining further, as requested by counsel, Simmons stated, "Well, I'm not an IT person, but they would be categorized into an electronic folder," as part of his e-mail application or, at times, stored outside of Outlook on his hard drive, (Tr. I at 138–40). The computer Simmons used, however, when he was manager of national programs was a laptop, and it was stolen at the Detroit Metro Airport.

Although Simmons had not been designated in the pretrial statement as a potential Kmart witness (other than through his deposition), Kmart sought leave at the evidentiary hearing to put Simmons on the stand for the limited purpose of testifying as to a search he had performed of the P- and W-drives. Kmart's counsel contended

that the proposed live testimony was not listed in the pretrial statement because the P- and W-drives had not previously been raised as an issue in this matter and that she had first learned of the existence of those drives the day before the evidentiary hearing. Although it was not clear why counsel would have only recently learned of the existence of the P- and W-drives, the court allowed Simmons to testify, limited to the subject of those drives.

Simmons testified first that he did not store documents on the P-drive. He claimed that he nonetheless made an effort to see if responsive documents resided there. When asked what he did, he stated:

> In opening up my computer, I used what they call opening up folders, and that gives me a list of all the folders that are available for me to look at.
>
> I opened up, of course, my own hard drive, take [sic] a look if T had any notes and documents that we stored there. Further, I went down to look into our (W:) drive in the various folders there. This was all a manual search for any information that dealt with exterior maintenance or Global Property Services.
>
> I also continued my search into what we call the (H:) drive and to a folder, personal folder that T used to store inactive documents, and I continued my search into the (P:) drive to also search for exterior maintenance for [sic] Global Property Services.

(Tr. II at 138–39). Simmons testified that he did not find any documents on the P-drive that related to Global or exterior maintenance services. When asked whether he found anything responsive on the W-drive, Simmons stated, "I have to say if I did find it, it was printed out and documented and provided to our counsel." (Tr. II at 139–40).

Simmons conducted this search after he was directed to look for information relating to Global, which was in September of 2005. That was the first time that he reviewed his files for responsive information.

As indicated above, Global also relied, in its effort to prove spoliation, on a number of e-mails between Kmart employees and Global employees, which Kmart had not produced. These external e-mails were received in evidence as Exhibit 19, and they range in date from March 6, 2002 to June 23, 2003, plus one e-mail dated April 2, 2004. The e-mails cover a variety of topics, including, *inter alia*, Kmart's national store list, performance issues, billing and payment matters, and the contracts prepared and forwarded by Global to various store managers for approval.

After the close of proofs in this case, the parties filed proposed findings of fact and conclusions of law, and oral arguments were subsequently heard by the court. The parties also filed responses to each other's proposed findings and conclusions on August 3, 2006. At about that time, Global filed a motion to reopen the record in this matter to include designated portions of testimony given at a deposition of one of Kmart's employees. The court denied that motion in an oral ruling issued on September 26, 2006. Thereafter, the court entertained a number of additional discovery motions in this matter, including Kmart's motion for production of electronic documents in native format, which was granted, after briefing by the parties, in an oral ruling issued on January 24, 2007,

*Discussion.*

## I.

■■■ A court's authority to impose sanctions for a party's failure to preserve or to produce documents is both inherent and statutory. *Diersen v. Walker,* 2003 WL 21317276 at *3 (N.D.Ill. June 6, 2003); *Danis v. USN Communications, Inc.,* 2000 WL 1694325 at *30 (N.D.Ill. Oct.23, 2000); *see also In re Old Banc One Shareholders Securities Lit.,* 2005 WL 3372783 at *2 (N.D.Ill.Dec.8, 2005) (citing *Chambers v. NASCO,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27, 50–51 (1991); *Larson v. Bank One Corp.,* 2005 WL 4652509 at *8 (N.D.Ill. Aug.18, 2005). "Whether proceeding under Rule 37 of the Federal Rules of Civil Procedure or under a court's inherent powers, the 'analysis is essentially the same.'" *Danis,* 2000 WL 1694325 at *30 (quoting from *Cobell v. Babbitt,* 37 F.Supp.2d 6, 18 (D.D.C.1999)); *see also Larson,* 2005 WL 4652509 at *8.[3] When seeking sanctions under subdivision (b) of Rule 37 (as opposed to other subdivisions of that rule), violation of a court order or discovery ruling of some sort is a prerequisite. *See, e.g. Brandt v. Vulcan, Inc.,* 30 F.3d 752, 756 (7th Cir.1994), in which the court stated that "Rule 37(b)(2) has been invoked only against parties who have disobeyed a discovery ruling of some sort." The court further noted that "[w]hile courts have only applied Rule 37(b)(2) where parties have violated a court order, courts have broadly interpreted what constitutes an 'order' for purposes of imposing sanctions." *Id.* (citations omitted); *see also Wiginton v. CB Richard Ellis,* 2003 WL 22439865 at *3 (N.D.Ill. Oct.27, 2003));

---

3. In *Danis,* the court also stated, however, that "the power to enter a default judgment or to dismiss a case for noncompliance with an order to preserve and produce documents for discovery 'depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery' by 'any party' and authorizes 'any order which is "just."'" *Danis,* 2000 WL 1694325 at *30 (quoting from *Societe Internationale Pour Participations Industrielles et Commerciales, S. v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)).

*cf. Maynard v. Nygren,* 332 F.3d 462 (7th Cir.2003) (proceeding under Rule 37(c) where no court order involved).

Sanctions are generally intended to serve the following purposes: (1) amelioration of prejudice; (2) punishment; and/or (3) deterrence. *See, e.g., Danis,* 2000 WL 1694325 at *31; *see also Larson,* 2005 WL 4652509 at *8. Courts have broad discretion to select the appropriate sanction for a discovery violation in light of the unique factual circumstances of the case. *See, e.g., Danis,* 2000 WL 1694325 at *31 (citations omitted); *see also Old Banc One,* 2005 WL 3372783 at *2. However, the Seventh Circuit has cautioned that sanctions must be proportionate to the offending conduct. *Id.*

Global asserts that a variety of sanctions are warranted in this case, including entry of a default judgment as to liability. Alternatively, Global seeks imposition of an adverse inference against Kmart (i.e., that the alleged destruction gives rise to an inference that the documents would have favored Global) and/or the imposition of a fine for Kmart's alleged discovery violations. In addition, Global urges that an intermediate remedy may be warranted, e.g., "a further investigation of Kmart's document retention and destruction practices, including the requirement that Kmart pay for a forensic examination, conducted by an expert of Global's choice, of Kmart's various repositories of electronic information." Global's Response to Kmart's Proposed Conclusion ¶ 81.

Kmart, on the other hand, asserts that Global has failed to establish that *any* sanctions are warranted in this case.

With respect to the sanction of default judgment (or a dismissal with prejudice), courts recognize that because it deprives a party of a hearing on the merits of its claim, it is a harsh remedy that should be reserved for the most egregious situations. *See, e.g., Danis,* 2000 WL 1694325 at *31, 33, Indeed, as noted in *Danis,* the Supreme Court has indicated that there are Fifth Amendment limitations on the power of courts to dismiss an action (or enter default judgment) without affording a hearing on the merits. *Id.* (citing *Societe Internationale,* 357 U.S. at 209, 78 S.Ct. 1087). Accordingly, courts hold that this sanction should ordinarily be employed only in extreme circumstances where there is evidence of "willfulness," "bad faith," or "fault." *See, e.g., Old Banc One,* 2005 WL 3372783 at *2 (citing *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir.1992)); *Diersen,* 2003 WL 21317276 at *3; *Danis,* 2000 WL 1694325 at *33; *see also Langley v. Union Electric Co.,* 107 F.3d 510, 514 (7th Cir.1997) ("Rule 37 sanctions may only be imposed where a party displays 'wilfulness, bad faith, or fault' ").

The Seventh Circuit described these three levels of culpability in *Marrocco.* There, one of two actions consolidated for appeal involved a products liability claim for damages sustained when a multipiece truck rim separated. The plaintiff sued both Firestone Tire and Rubber Company, which manufactured the rim base, and the Goodyear Tire and Rubber Company, which manufactured the side ring. The parties stipulated to a protective order providing a time frame for Goodyear to inspect these components, as long as Goodyear preserved and maintained their condition. *Marrocco,* 966 F.2d at 222. The rim base and side ring were then shipped to Goodyear's headquarters, and because of careless packaging, the side ring never arrived. Goodyear exacerbated the situation by waiting nearly three months to run a trace through UPS for the side ring or to inform the plaintiff that it was missing. *Id.*

In upholding the district court's directed verdict against Goodyear, the Seventh Circuit rejected Goodyear's contention that sanctions should be imposed only where non-compliance is willful or deliberate. *Id.* at 224. The court explained:

... [T]he Supreme Court has expressly stated that sanctions may be appropriate in any one of three instances—where the noncomplying party acted *either* with willfulness, bad faith or fault. . . . These three measures of culpability are each wholly distinct from one another. "Bad faith," for instance, is characterized by conduct which is either intentional or in reckless disregard of a party's obligations to comply with a court order. "Fault," by contrast, doesn't speak to the non-complying party's disposition at all, but rather only describes the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation.

Goodyear's conduct readily falls within the classification of "fault." It reflected extraordinarily poor judgment in the way it packaged, labeled and handled the rim base and side ring. Equally inexcusable is the uncontested finding that Good-year stood idly for months before it attempted to investigate the side ring's apparent loss; it waited even longer before informing the plaintiffs that the side ring was missing. These omissions cannot be characterized merely as a mistake or carelessness. Rather, they reflect gross negligence on the part of Goodyear—a flagrant disregard of its assumed duty, under the protective order, to preserve and monitor the condition of evidence which could be pivotal in a lawsuit.

*Id.* (emphasis in original; citations omitted). *See also Diersen,* 2003 WL 21317276 at *3 ("'Bad faith' means destruction 'for the purpose of hiding adverse information'") (quoting from *Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1155 (7th Cir.1998)). In *Long v. Steepro,* 213 F.3d 983 (7th Cir.2000), the Court stated that while wilfulness and bad faith are "associated with conduct that is intentional or reckless," fault is not. However,

[f]ault ... is not a catch-all for any minor blunder that a litigant or his counsel might make. Fault, in this context, suggests objectively unreasonable behavior; it does not include conduct that we would classify as a mere mistake or slight error in judgment.

*Id.* at 987.

Understandably, the quantum of proof necessary for the imposition of the various sanctions depends on the severity of the specific sanction sought. *Larson,* 2005 WL 4652509 at *9. Clear and convincing evidence of willfulness, bad faith, or fault is required for the sanction of dismissal with prejudice or default judgment. *See Maynard,* 332 F.3d at 468; *Krumwiede v. Brighton Associates, LLC,* 2006 WL 1308629 at *9 (N.D.Ill. May 8, 2006); *Larson,* 2005 WL 4652509 at *9; *Danis,* 2000 WL 1694325 at *34. Non-dismissal sanctions are generally permissible even without clear and convincing evidence. *Maynard,* 332 F.3d at 469; *see also Danis,* 2000 WL 1694325 at *34 n. 22 (preponderance standard should apply to "issue-related" sanctions, such as adverse inferences and preclusion of evidence, because they are fundamentally remedial and do not preclude hearing on merits; however, clear and convincing standard should apply to fines, which are fundamentally penal).

Of course a further prerequisite to the imposition of sanctions for spoliation of evidence, in addition to the so-called "culpability" requirement discussed above, is a determination that the party had an obligation to preserve the docu-

ments in question. *See, e.g., Cohn v. Taco Bell Corp.,* 1995 WL 519968 at *5 (N.D.Ill. Aug.30, 1995); *Diersen,* 2003 WL 21317276 at *4. While the scope of the preservation duty is broad, *see e.g., Larson,* 2005 WL 4652509 at *10; *Wiginton,* 2003 WL 22439865 at *4; *Danis,* 2000 WL 1694325 at *32, the "duty to preserve potentially discoverable information does not require a party to keep every scrap of paper" in its file. *Old Banc One,* 2005 WL 3372783 at *3; *see also Wiginton,* 2003 WL 22439865 at *4; *Danis,* 2000 WL 1694325 at *32. "The duty to preserve evidence includes any relevant evidence over which the non-preserving entity had control and reasonably knew or could reasonably foresee was material to a potential legal action." *China Ocean Shipping (Group) Co. v. Simone Metals Inc.,* 1999 WL 966443 (N.D.Ill. Sept.30, 1999); *see also Danis,* 2000 WL 1694325 at *32 (litigant has duty to preserve what it knows or reasonably should know is relevant, is reasonably calculated to lead to discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is subject of pending discovery request).

▇▇▇▇ Accordingly, "[a] party's duty to preserve specific types of documents does not arise unless the party controlling the documents has notice of those documents' relevance." *Old Banc One,* 2005 WL 3372783 at *3; *see also Cohn,* 1995 WL 519968 at *5. This notice ordinarily comes from discovery requests or from the complaint itself. *Old Banc One,* 2005 WL 3372783 at *3; *see also Cohn,* 1995 WL 519968 at *5; *Danis,* 2000 WL 1694325 at *33. However, "the obligation to preserve evidence may arise prior to the filing of a complaint where a party is on notice that litigation is likely to commence." *Cohn,* 1995 WL 519968 at *5; *see also Wiginton,* 2003 WL 22439865 at *4 ("[n]otice may be received before a complaint is filed if a party knows that litigation is likely to begin").

▇▇▇▇ Finally, while prejudice is not an element in imposing sanctions, the prejudice to the non-offending party should be considered by the court. *See, e.g., Old Banc One,* 2005 WL 3372783 at *4 (citing *Marrocco,* 966 F.2d at 225); *China Ocean,* 1999 WL 966443 at *3; *Larson,* 2005 WL 4652509 at *13; *see also Diersen,* 2003 WL 21317276 at *3 (though Seventh Circuit has held that finding of prejudice is not required to enter dismissal or judgment as sanction under inherent power, such serious sanction should not be invoked without first considering effect challenged conduct has had on course of litigation) (citing *Barnhill v. U.S.,* 11 F.3d 1360, 1368 (7th Cir.1993)). In cases where spoliation is the result of "fault," as opposed to willfulness or bad faith, courts often use prejudice as a " 'balancing tool' to tip the scales in favor of or away from severe sanctions." *Larson,* 2005 WL 4652509 at *13; *Danis,* 2000 WL 1694325 at *34. For example, in *Marrocco,* discussed above, the loss of the "side ring" prevented the plaintiffs from establishing a prima facie case of negligent manufacturing. Noting that the evidence was lost as a result of Goodyear's "flagrant disregard of its assumed duty under the protective order, to preserve and monitor the condition of evidence which could be pivotal," the Seventh Circuit affirmed the district court's entry of a directed verdict against Goodyear. *Marrocco,* 966 F.2d at 224–25.

In *Larson,* on the other hand, the court declined to enter a default judgment where prejudice—resulting from loss of evidence based on "fault"—could be remedied by a lesser sanction. That case involved a shareholder action arising out of the merger of Banc One Corp. ("Old Banc One") with First Chicago NBD. The plaintiff shareholders of Old Banc One alleged that

misrepresentations had been made in the merger proxy/prospectus regarding the financial well-being of Old Banc One's credit card division, which had the effect of artificially inflating the stock price at the time of the merger. *Larson*, 2005 WL 4652509 at *1–2, During the litigation, Old Banc One was unable to produce the underlying data and calculations relating to certain "remediation estimates" that were central to the process of establishing the misrepresentations. The plaintiffs' expert claimed that without the underlying data, he could not precisely estimate by how much the division's financial condition had been overstated. *Id.* at *14. Nonetheless, the court declined to enter a default judgment and instead "level [ed] the playing field" by preventing Old Banc One from cross-examining the plaintiffs' expert concerning his own estimates and by instructing the jury as to the limitation and the reason for its existence. *Id.* at *14–15. Again, the court used prejudice as a balancing tool to tip the scales away from the draconian sanction of default judgment, where a lesser sanction could remedy the harm.

## II.

In this case, the parties first dispute the applicable "trigger date," i.e., the date that Kmart's obligation to preserve documents relating to this matter arose. Global contends that the trigger date should be May 7, 2003, i.e., the date of William Ellis' e-mail, in which he stated, *inter alia*, that as Kmart's business with Global "melt[ed] away," he was "certain" that they would take legal action. (Exh. 23). Global further contends that in no event can the trigger date be later than June 19, 2003, the date that Global filed its administrative claims. Kmart, on the other hand, urges that it did not have an obligation to preserve documents relating to this litigation until after it had evaluated Global's claims and formulated its objections thereto. Accordingly, Kmart suggests that the trigger date was "approximately early 2004," or shortly before the filing of its Nineteenth Omnibus Objection to Claims on Feb. 2, 2004. *See* Kmart Proposed Conclusion ¶ 49; Kmart's Response to Global's Motion for Sanctions, at 3.

Again, the duty to preserve documents arises when a party is on notice of the potential relevance of the documents to pending or impending litigation, and a party may be on notice even prior to the filing of a complaint. In *Zubulake v. UBS Warburg L.L.C.*, 220 F.R.D. 212 (S.D.N.Y. 2003), for example, where plaintiff was suing her former employer for gender discrimination and illegal retaliation, the court found the defendant chargeable with a preservation duty approximately four months before the filing of plaintiff's EEOC charge. The court first noted that the duty to preserve arose at the latest when the charge was filed, in August 2001,[4] and at that time, the defendant's in-house attorneys in fact cautioned employees to preserve potentially relevant documents, Zubulake contended, however, that the defendant should have known of the potential relevance of the information as early as April 2001, and she offered two pieces of evidence in support. *Id.* at 216. First, she noted that certain employees were titling e-mails at that time as "UBS Attorney Client Privilege," even though no attorney was copied on the e-mails and the substance was not legal in nature. *Id.* at 216–17. Second, the plaintiff's supervisor had admitted during his deposition that he

4. The court cited to a statement by defendant's counsel agreeing that the preservation duty attached no later than August 2001. *Id.* at 216 n. 14.

feared litigation from as early as April 2001. *Id.* at 217.

The court stated that "[m]erely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve." *Id.* However, the court went on to note (citing evidence in support) that in Zubulake's case, "almost everyone associated with [her] recognized the possibility that she might sue." *Id.* Accordingly, the court found April 2001 to be the trigger date for her employer's duty to preserve documents.

Here, the evidence does not establish that "almost everyone" dealing with Global believed that litigation was likely. Ellis sent the May 7, 2003 e-mail only to Randy Andresen; no one else at Kmart is shown as receiving a copy. Although Andresen's responsive e-mail states that he "will go over this with the Dms [i.e., district managers] at [their] meeting next week" (Exh. 23), there is no evidence that he did so. Thus, although Ellis was the highest level employee in Kmart's management chain that had dealings with Global,[5] the evidence does not show that anyone other than Ellis and Andresen recognized the possibility of legal action by Global.

Moreover, Ellis credibly testified that the e-mail was more of a warning on how to conduct business with Global; indeed, it concluded with the statement: "Just don't give Global any reason to come back on us." (Exh. 23). Under all the circumstances, the court is not inclined to view the inception of Kmart's preservation duty as May 7, 2003.

■■■ Kmart did have a duty, however, to preserve documents relating to Global's administrative claims by the time they were filed on June 19, 2003, or a short period thereafter. The court so holds not because the claim filing date *per se* constitutes the latest possible trigger date, as urged by Global, *see, e.g.,* Global Response to Kmart Conclusion ¶ 39,[6] but because the particular administrative claim filed in this case contained sufficient information to put Kmart on notice that litigation was likely.

As for Global's assertion of a *per se* rule, the court notes that while a proof of claim has at times been analogized to a complaint in civil litigation (and the objection thereto as an answer), *see, e.g., In re Lomas Financial Corp.,* 212 B.R. 46, 55 (Bankr.D.Del.1997), it has also been observed that it is the objection to claim that marks the commencement of litigation by initiating a "contested matter" within the purview of Bankruptcy Rule 9014. *See, e.g., In re State Line Hotel, Inc.,* 323 B.R. 703, 710 (9th Cir. BAP 2005); *vacated on other grounds,* 2007 WL 1961935 (9th Cir. 2007); *see also* Advisory Committee Note accompanying Fed.R.Bankr.P. 3007 (contested matter "initiated" by objection to claim). Bearing in mind that the "trigger date" should represent the date by which a party is on notice of the potential relevance of documents to pending or impending litigation, a *per se* rule that the claim filing date is the latest possible trigger would seem inappropriate. Proofs of claim are often perfunctory, containing few, if any, details concerning the bases for liabil-

---

5. Along with the vice president of in-store operations, who would have been Ellis' peer in this regard.

6. Global states in its response to ¶ 39 that "Kmart's duty to suspend its routine destruction of documents arose on June 19, 2003, *as a matter of law.* Courts are united: a corpo-ration must suspend its routine document destruction policy once litigation commences." (emphasis added; citations omitted). *See also* Global Proposed Findings ¶'s 89 ("the litigation officially commenced on June 19, 2003, with the filing of Global's Claims"), 78 and 79, and Proposed Conclusion ¶ 120.

ity. On the other hand, setting the "trigger" in this matter as the objection filing date (or a date shortly before such filing), as urged by Kmart, seems equally unreasonable, not only because the objection deadline may be months or even years after the claim was filed, but also because the onset of the duty would then be largely in Kmart's control.

The court is mindful of Kmart's contention that in a bankruptcy case of this magnitude, with tens of thousands of claims, it would be impractical and illogical to hold that the claim filing date triggers a preservation duty. *See, e.g.,* Kmart Proposed Conclusions ¶'s 39, 48. Kmart urges that such a holding would require mega-debtors, such as Kmart, "to place a company-wide litigation hold on every document while it evaluated tens of thousands of claims." *Id.* Again, however, in light of the central question of notice, the determination should depend on all the facts and circumstances of the case. Kmart could have singled out, within a very short period after filing,[7] those claims that were substantial and would, based on allegations contained therein, clearly be disputed. Here, Claim No. 53442 stated, on the face of the claim, that it was for "Breach of Contract, Tortious Interference, and Defamation" by Kmart, as debtor in possession. Oftentimes, proofs of claim contain little more information than that. Global, however, attached Exhibits A and B, further alleging that damages could "exceed $1,000,000 per year for an undetermined number of years, representing [Global's] lost profits" and that Global could also have "economic claims for unjust enrichment, as well as, claims for punitive damages stemming from various torts (i.e., tortious interference and defamation per se)

under various state laws," In Exhibit B, Global then set forth allegations concerning, *inter alia,* its purported status as a national contractor for Kmart's white and green services, Kmart's audit of Global's books, the Audit Agreement (with its provision that Kmart would not contract or otherwise interfere with Global's subcontractors), and Kmart's alleged subsequent breach of that agreement. Given the rather detailed allegations in this particular proof of claim, together with the multimillion dollar exposure claimed on an administrative basis (i.e., 100% payout—*see, e.g.,* § 1129(a)(9)(B)), it should not have taken long to identify this claim as one "likely" to be litigated. Accordingly, while the claim filing date is a *per se* the trigger date for the obligation to preserve information, under the circumstances present here, Kmart's duty did in fact arise shortly after June 19, 2003.

■ The record establishes that Kmart did not put a litigation hold into place at that time—or for that matter, even in February of 2004, when the Nineteenth Omnibus Objection to Claims was filed. Pocius testified that he was not aware of anyone at Kmart implementing a litigation hold with respect to the Global claims. He also indicated that Kmart did not implement a policy for archiving H-drive data for departing employees until October of 2005, i.e., sometime after the merger with Scars. Todd Eschtruth, who described the "boot and nuke" program for "cleansing" the C-drives of terminated employees, testified that there was an exception to the cleansing procedure for individuals considered to be on "legal hold," but that the "legal hold" concept had only "been around since September of 2005," during the transition after the merger. Stephen Burke likewise

---

7. The claims were filed with Trumbull Services LLC, the claims agent in this case, and

were subsequently forwarded to Kmart.

testified that although IT had the ability to turn the automatic e-mail deletion feature off and on and that such suspension was effected for particular individuals when a request was made, he was not aware of any written policy regarding "litigation hold" or "legal hold" prior to the merger with Sears. According to Burke, the automatic deletion of e-mail pursuant to Kmart's record retention policy was not suspended until October of 2005—again, after the merger.

Indeed, Kmart acknowledges that before the merger with Sears, Kmart had no written policy in place regarding a "legal hold." *See* Kmart Proposed Finding f 34. Kmart further "admits it did not implement a formal litigation hold in early 2004," i.e., about the time its Nineteenth Omnibus Objection to Claims was filed. *See* Kmart Response to Global Proposed Finding ¶ 97. Although to date, there appears to be no hold in place specifically tailored to this contested claim litigation (*see, e.g.,* April 12, 2006 transcript, at 96), Global acknowledges that the destruction of e-mail and certain other information was generally placed, in effect, on hold in October of 2005, when Kmart suspended the automatic deletion of employee e-mail and the boot and nuke procedures for terminated employees' hard drives. *See, e.g.,* Global Response to Kmart Conclusion ¶ 61; Global Proposed Finding ¶ 89.

While Kmart acknowledges that it had a "duty to preserve possibly relevant evidence" at least as of "early 2004," it contends it did not have an obligation to impose a "litigation hold." *See* Kmart Conclusion ¶ 51; Kmart Response to Global Finding ¶ 97 ("Kmart contends that it had a duty to preserve evidence—not suspend its email retention and storage policies—beginning in early 2004") and Response to Global Conclusion ¶ 120 ("Kmart ... disputes that ...

the law in this district requires the implementation of a legal hold"). Kmart thus distinguishes between the duty to preserve evidence and the means employed to satisfy that duty.

■ In *Danis,* the court noted that "the types of steps that must be taken to satisfy the obligation to preserve evidence may vary from case to case, based on the circumstances facing the defendant." *Danis,* 2000 WL 1694325 at *39. However, the "duty to preserve documents in the face of pending litigation is not a passive obligation," but must be "discharged actively." *Id.* at *32 (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 169 F.R.D. 598, 615 (D.N.J.1997), which further stated that "[w]hen senior management fails to establish and distribute a comprehensive document retention policy, it cannot shield itself from responsibility because of field office actions"). *See also Old Banc One,* 2005 WL 3372783 at *4 ("any policies that Bank One had in place were not properly disseminated to ... employees," and "it took ten months for Bank One to tailor a policy for the Larson litigation"). In *Larson,* the court stated: "As a large corporation, Bank One can only discharge its duty by: 1) creating a 'comprehensive' document retention policy that will ensure that relevant documents are retained, ... and 2) disseminating that policy to its employees." *Larson,* 2005 WL 4652509 at *11 (citations omitted). The court further stated that "the document policy must contain enough specificity to the litigation, or scope, to ensure that relevant documents are preserved." *Id. See also Danis,* 2000 WL 1694325 at *37–38 (noting that steps taken—"or lack of steps"—to carry out preservation duty did not constitute "the kind of 'comprehensive document retention policy' that the case law envisions," and while no intentional destruction of documents had occurred,

the "failure to put into place clear procedures and standards concerning document preservation, and the failure to do any follow-up to see that the general oral directive was broadly disseminated and followed, constitute[d] fault ...." (citations omitted)).

Thus, while the failure to implement a litigation hold does not necessarily give rise to sanctions for spoliation of evidence, it is at least "relevant" to the spoliation inquiry, Kmart's contrary assertions notwithstanding. *See* Kmart Response to Global Finding ¶ 98. In *Diersen*, the court noted that "[w]hile [the defendant] need not have an official written policy regarding the preservation of documents related to litigation to avoid sanctions," its "apparent failure to warn its employees to preserve documents potentially relevant to this litigation evidences fault...." *Diersen*, 2003 WL 21317276 at *4–5. Under the circumstances of this case, Kmart's failure to adequately warn its employees to preserve documents potentially relevant to this contested claims litigation, at a time when the preservation duty had already attached, likewise evidences "fault" within the purview of the case law discussed above and suggests that if discoverable information was destroyed, it was done with the requisite measure of culpability.

The court rejects, however, Global's contention that Kmart has acted with willfulness or in bad faith. Global has presented no evidence that Kmart destroyed documents intentionally or for the purpose of hiding adverse information. There was no testimony that employees had willfully destroyed any documents, and those who did testify indicated otherwise. Ellis, for example, testified that he preserved and produced everything he had. He stated that from the time he assumed his position in facilities maintenance, he had retained all of his e-mails in his H-drive, so that they would not be deleted. He further stated that he did not store documents anywhere other than on his H-drive, and he searched his H-drive to retrieve anything related to Global.

Global, however, contends that Kmart's "refusal" to implement a litigation hold is evidence of bad faith and willful misconduct. *See, e.g.*, Global Response to Kmart Conclusion ¶ 59. Global notes that bad faith in this context "does not necessarily involve direct acts of destruction," but may also encompass "willful blindness." *Id.* (citing *Wiginton*, 2003 WL 22439865 at *13). Global urges, *inter alia*, that because Kmart "knew that the systematic destruction of documents was taking place and made the conscious decision to allow [that] to continue to occur," Kmart acted with "willful blindness." *See* Global Response to Kmart Conclusion ¶ 59.

In *Danis*, the court acknowledged that bad faith may encompass "willful blindness," but found that the record in that case did not support such a finding. *Danis*, 2000 WL 1694325 at *38. *Danis* involved a class action brought by purchasers of the common stock of USN Communications, Inc., alleging securities fraud against certain of USN's officers and directors, the companies who had managed the underwriting of USN's initial public offering, and the accounting firm that had audited USN's financial statements.[8] The plaintiffs ultimately filed a motion for sanctions, alleging that USN had destroyed key sales, financial, and accounting documents critical to plaintiffs' proof that USN's public finan-

---

8. Although USN was named as a defendant in the original securities suits, it was omitted from the amended complaint after the suits were consolidated, as USN was by then in bankruptcy.

cial statements were false and misleading. *Id.* at *7–8. The plaintiffs' motion focused largely on four specific categories of allegedly missing documents (i.e., "(1) Monthly Sales Roll Up Reports; (2) Final Sum and Final Sum Summary Reports; (3) Aged Accounts Receivable Reports; and (4) Monthly Close Packages"). *Id.* at *8,

The court, conducting a detailed review of the evidence, found that although USN had made efforts to preserve documents (and indeed had produced a massive amount of information), the inadequacies in its document preservation program had left several potential gaps. *Id.* at *16. For example, substantial offices were closed and dumpsters full of documents were discarded without any prior attorney review and without the discarding employees having any criteria to use for preserving documents necessary to the litigation. In addition, e-mail files of terminated employees were purged, again without a systematic procedure to insure that nothing needed to be preserved. *Id.* at *39, 43. Nonetheless, the court rejected the plaintiffs' "willful blindness" contention, stating:

> The question of intent and/or bad faith, of course, may encompass not only direct destruction, but also "willful blindness" (especially in the face of of-

fice closings where documents were being thrown out without criteria based on a systematized document preservation plan in place that officers of the company were monitoring with vigor). But the plaintiffs have not offered any evidence to support the willful blindness theory (*e.g.*, they have not shown the Court that Mr. Elliott knew that relevant, discoverable financial data had been left on the 4th Floor of the executive offices, or in his office, but nonetheless allowed those offices to be swept clean and purged of documents).

*Id.* at *38. Accordingly, the court found that in spite of the systematic destruction of large volumes of information, the individual defendant, Mr. Elliott (USN's CEO), had acted with "fault," rather than willfulness or bad faith.[9] *Cf. Wiginton*, 2003 WL 22439865 at *1–2, 7 (court found willful blindness rising to level of bad faith, where defendant, knowing that relevant documents would be destroyed if it did not act to preserve them, continued to follow its normal document retention and destruction policies).[10]

Here, Global has failed to establish that Kmart knew there was relevant, discoverable information among the documents being destroyed pursuant to the company's

---

**9.** The court held that although it could not hold USN responsible for any breach of the preservation duty—as USN, then in bankruptcy, was no longer a defendant in the case—it could hold USN's CEO responsible, as he had acted with "extraordinarily poor judgment," particularly in view of the fact that the corporation was closing its offices and discarding massive amounts of information. *Danis,* 2000 WL 1694325 at *38–41. The court imposed a fine, ordering the CEO to pay the sum of $ 10,000 into the court registry. *Id.* at *51.

**10.** In *Wiginton,* plaintiff's counsel had sent defendant's counsel a letter only two days after the filing of the complaint, itemizing in great detail the types of electronic and other

files that would be requested in the litigation and requesting that the letter be forwarded to all persons with custodial responsibility for same. *Id.* at *1–2. The court found, *inter alia,* that the defendant's "complete failure to perform any search" for electronic or other information (at least prior to the entry of an agreed preservation order later in the case) led the court to a finding of bad faith. *Id.* at *7. However, the motion for sanctions was nonetheless denied, though without prejudice to plaintiff's renewing it in the event that her expert were able "to discover relevant documents" on certain backup tapes that the court believed "may give some evidence into what was destroyed." *Id.* at *8.

preexisting document retention/destruction policy. Indeed, as discussed further below, it is not entirely clear that such information was, in fact, destroyed. And the court finds no reason to infer from the circumstances in this case that Kmart's failure to warn its employees about the need to preserve documents or to implement a document preservation program tailored to this litigation was intentional or for the purpose of hiding adverse information. Accordingly, the court finds that while Kmart's conduct evidences fault, the record does not establish bad faith or willful misconduct.

 The court further concludes that although Global has established that Kmart's preservation obligation arose shortly after Global filed its administrative claims on June 19, 2003, and further has established that Kmart's conduct evidenced "fault" within the meaning of the applicable case law, sanctions for spoliation of evidence are not warranted on the present evidentiary record. First, as indicated above, it is not entirely clear that relevant, discoverable information was in fact destroyed after the duty to preserve attached. Of the forty-three employees identified by Kmart as individuals with knowledge of Global's claims and Kmart's defenses, some were former employees who were terminated long before Kmart's preservation obligation arose. For example, Thomas Buser, who was Divisional Vice President of Facilities Services and, according to Kmart, one of the key witnesses in this matter, was terminated on October 3, 2002. Pursuant to Kmart's preexisting document retention/destruction

policy, all items in Buser's mailbox would have been deleted in the ordinary course of business by approximately April 2, 2003.[11] Similarly, the e-mails of employees Tan Scott and Timothy Slimp, also characterized by Kmart as "key witnesses," would have been deleted in the ordinary course by approximately April 5 and 6, 2003, respectively. The hard drives for these employees would have been irrecoverably erased within two weeks after their respective termination dates pursuant to Kmart's unwritten procedure for the cleansing and redeployment of terminated employees' hard drives.

Global argues that Kmart has failed to show that documents were *actually* destroyed pursuant to its document retention/destruction policy, because, *inter alia*, Kmart was able to locate e-mail files for Buser, Scott, Slimp, and others. (See Exh. 26). Global repeatedly urges that Kmart presented no evidence that the e-mails and hard drives of these employees or others were in fact deleted or erased. *See, e.g.,* Global Responses to Kmart Conclusions ¶ 55 ("Kmart presented no evidence that … Buser's e-mail was deleted or that [his] hard drive was erased") and ¶ 22 (while there is evidence that Kmart had a practice of erasing former employees' hard drives, "[t]here is no evidence on the record that the hard drives of any Kmart employees were *actually* erased," and Kmart "presented no evidence that it made any effort to search for the hard drives of any of its former employees") (emphasis added). Global presumably takes this position in an effort to show that documents may still have existed as of the

---

**11.** This date is 181 days after Buser's termination and assumes that Buser had moved discoverable e-mails into a user-defined folder. According to Burke's testimony, e-mails in a user-defined folder would, at the end of the 180–day retention period, be moved to the deleted items folder and reside there for one

day prior to deletion. Even if the additional two-week period described by Burke is included (i.e., when the e-mail resides, after deletion, in a different area on the e-mail server), as well as the 28–day period on backup tape, the information would still have been gone before the June 19, 2003 trigger date.

trigger date and were only destroyed *after* the preservation duty arose. However, the fact that documents *may* still have existed as of the trigger date and *may* have been destroyed later does not establish that they were, in fact, so destroyed. Indeed, as discussed further below, the court believes that Global's repeated urgings that Kmart has failed to establish the *actual* destruction of e-mails and hard drives—while tending to support Global's claim of a failure to adequately search for and produce information—merely tend to undermine Global's claim for spoliation.

As for the other employees listed in the parties' pretrial statement, who were terminated in January 2003 and thereafter (i.e., Jose Villareal, Gregory Morck, Richard Evanchyck, Ryan Shea, Claudia Werges, George Brownsworth, and Shawn Husband), their documents were not scheduled for deletion in the ordinary course prior to the trigger date. However, Global has failed to establish that such employees had any relevant or discoverable information in their respective repositories at the time Kmart's preservation duty attached. For example, Global failed to adduce any evidence that Villareal created user-defined folders. It also failed to establish what relevant or discoverable documents he generated or could be expected to generate that were not produced, either from his Outlook Mailbox, hard drive, or the H-, P-, or W-drives. Indeed, Global again argues, as to Villareal (and the other employees), that Kmart "presented no evidence whatsoever that Mr. Villareal's C: drive was *actually* erased" or that his e-mail was deleted. *See* Global Response to Kmart Finding ¶ 95 and Response to Kmart Conclusion ¶ 55 (emphasis added). "In fact," urges Global, "Kmart was unable to present any evidence that it even conducted a search for Mr. Villareal's documents." *Id.* And with respect to the remaining drives, Global likewise urges a failure to search;

i.e., since Kmart had not completed its search of H-drive information as of the time of the hearing, or even begun a systematic search of the P- and W-drives, it had "violated its duty to search for, gather, and produce responsive documents." *See, e.g.,* Global Response to Kmart Finding ¶ 92.

As for the current employees, Global has failed to establish which of the forty-three individuals identified by Kmart were current employees likely to have relevant or discoverable information at the time Kmart's preservation duty attached and to show that any such information was destroyed.

Global relies in part on the documents produced by Slimp, including the document Bates-stamped "Slimp 00014," which was the "National Contracts Call List," i.e., the revised frequently called telephone list for the national contractors, which Simmons (a current employee) had saved to the W-drive. As indicated above, Global claims that the National Contracts Call List is highly relevant to its claims, because it lists Global along with Kmart's other national contractors. Since there was no automatic deletion feature with respect to the W-drive, Global argues that *either* Kmart has deleted the National Contracts Call List from the W-drive or, if it remains there, Kmart has failed to retrieve and produce it. (Tr. I at 176). In this regard, the court notes that Global has again forcefully argued a failure to search. Global states, *inter alia,* that:

> Kmart's *only* effort to search the P: or W: drives was by one employee, Bill Simmons, in September 2005 ..., Although there are millions of documents on the P: and W: drives, there is no evidence in the record that Mr. Simmons' search of these drives was in any way comprehensive or complete.... For

example, Mr. Simmons does not identify whether he used search terms or looked for responsive documents for any of the individuals Kmart identified in its initial disclosures.

Global Response to Kmart Conclusion ¶ 23 (emphasis in original). Global goes on to urge that "[t]he Court also has good reason to doubt Mr. Simmons' testimony," because "[w]hile [he] claims to have searched [the] W: drive for responsive information, Kmart has not produced documents that Mr. Simmons himself claims to have saved on the W: drive," i.e., the National Contracts Call List, Slimp 00014. *Id.*

The court agrees that Kmart has not adequately searched the W-drive and declines to find that the National Contracts Call List, saved by Simmons to that drive, has been destroyed. While Kmart's failure to produce the list does not in these circumstances establish spoliation, it does tend to support Global's assertion that Kmart has failed in its duty to adequately search for and produce responsive information.

With respect to the remaining e-mails produced by Slimp, the court notes that they range in date from September 5, 2001 to August 22, 2002. As indicated above, to the extent that they resided on Kmart's e-mail servers,[12] they would have been automatically deleted in the ordinary course under Kmart's document retention policy, well before even May 7, 2003.

Global also relies, in its attempt to prove spoliation, on the external e-mails, i.e., the e-mails between Kmart employees and Global employees that Kmart did not produce. As indicated above, the external e-mails range in dale from March 6, 2002 to June 23, 2003, plus one e-mail dated April 2, 2004. Accordingly, many of them would have survived the trigger date pursuant to the deletion schedule contained in Kmart's document retention/destruction policy. The court notes that while these later e-mails do relate—in one way or another—to the relationship between Global and Kmart, Global has not identified or explained which of them, if any, are supportive of its position. Indeed, none of them appear to be unfavorable to Kmart. For example, in a March 12, 2003 e-mail from Global's Tom Pakenas to twenty-two Kmart store managers, Pakenas states that he is in the process of gathering bids and performing cost analysis for the stores' landscaping needs for the coming season, and he asks whether the scope of services at their stores has changed in any way. He further states that when he completes his analysis, he will be forwarding the contracts to the store managers for their review and approval. (Exh. 19, doc. no. GPS028937). The next day, the store manager for store number 3059 wrote to Pakenas that no contracts would be needed for his store and that he would like to discontinue the sweeping service as of March 15, 2003, stating he would "contract everything locally." *Id.* On March 18, 2003, Pakenas responded: "I respect your decision and will comply. Please be aware that Global Property Service contractors have signed a non-compete and are prohibited from working directly with our clients for a specified period of time." *Id.* While these e-mails are discoverable, they do not serve to substantiate Global's contention that it was a national contractor or even its contention that Kmart interfered with the relationships between Global and its subcontractors. Although Pakenas' March 18, 2003 response contains a reminder that the store manager, who intends to "contract

---

**12.** Again, the documents in Exhibits 17 and 18 were retrieved from the hard drive of a laptop that Slimp failed to return to Kmart when he was terminated in October of 2002.

everything locally," may not contract with any of Global's subcontractors, there is nothing to indicate that he did. And as for Global's "national contractor" theory, there is nothing in this chain of e-mails to support it. In fact, they tend to show that the decision whether to contract with Global was made locally, at the store level.

If this chain of e-mails is otherwise supportive of the theories Global has advanced in its claims, Global has failed to explain why. The other e-mails in Exhibit 19 that would have been scheduled for deletion after the trigger date are either similar to those just discussed or even less probative. However, because they relate to the Kmart/Global relationship, they are discoverable.

While these e-mails may, accordingly, show that some discoverable information was lost through the failure to take adequate preservation measures,[13] there has been, again, no showing that any of them were unfavorable to Kmart, such that Global would have been prejudiced by their loss—or the loss of similar types of documents.[14]

Global nonetheless urges that it has established prejudice in this matter, not only through the extrinsic evidence just discussed, but also by virtue of the widespread destruction of documents pursuant to Kmart's document retention/destruction policy. Global states, *inter alia:*

[C]ourts look to extrinsic evidence to support a finding of prejudice, such as previously destroyed documents that are recovered from an alternative source.... *Moreover, the pervasive or widespread destruction of documents alone will support a finding of prejudice* ....

In this case, Global has presented sufficient evidence of both factors—extrinsic evidence of documents recovered from other sources and the wide spread destruction of documents—to meet its burden of demonstrating prejudice as a result of Kmart's spoliation.

Global Response to Kmart Conclusion ¶ 70 (emphasis added; citations omitted). Again, however, the extrinsic evidence provided by Global does not indicate that anything unfavorable to Kmart was destroyed pursuant to its ordinary course document destruction policy. Moreover, with respect to Global's contention that the pervasive or widespread destruction of documents alone will support a finding of prejudice, the court finds the *Danis* opinion instructive. There, the court first acknowledged that there had been a sweeping destruction of information as a result of inadequate preservation efforts:

... [I]t is clear that as a result of the failure to implement a suitable document preservation plan, to communicate that plan effectively to all employees, and to

13. On the other hand, Kmart may simply have failed to conduct an adequate search. Indeed, Global again states: "Kmart has either not searched for these e-mails, has not been able to find these e-mails, or simply has not produced the e-mails contained in Exhibit 19." Global Response to Kmart Finding ¶ 146.

14. Although the Slimp documents have now been produced, Global relies on them as extrinsic proof of the *types* of documents that may have been lost as a result of Kmart's inadequate preservation efforts. Global's

counsel referred to the Slimp documents as "one source for the Court to understand the types of information that is [sic] potentially in the hole of missing documents. These particular documents are no longer missing because we got lucky and happened to find them. But in trying to understand the potential prejudice to Global as a result of this doughnut hole of missing documents that were potentially destroyed in this case, this can be used as probative to understand that fact." (Tr. I at 163).

follow up to insure that the directive was being followed, there were holes in the document preservation plan through which discoverable materials may have been lost. Large quantities of documents were discarded from closed sales offices without attorneys first reviewing them, and without the employees who selected what to preserve and what to discard knowing what criteria to use for purposes of preserving documents necessary for the litigation. E-mail files of terminated employees also were purged, without there being a systematic procedure for insuring that nothing on those files needed to be preserved for the lawsuit.

*Danis*, 2000 WL 1694325 at *43. Nonetheless, "[b]ecause the inadequacies in the document preservation program were the result of fault ... and not intentional efforts to destroy responsive documents," the court refused to "draw the inference that these gaps caused plaintiffs to lose responsive documents that were, as [they] allege[d], 'critical to plaintiffs' proof in the case." *Id.* The court found its conclusion bolstered by the evidence and went on to focus on the *specific* categories of documents that plaintiffs alleged had been lost. *Id.*

This court likewise declines to infer that documents unfavorable to Kmart were destroyed pursuant to its ordinary course document deletion policies, causing prejudice to Global, As discussed above, Kmart acted with fault, but not with willfulness or bad faith, and the evidence adduced—including the extrinsic proof offered by Global—fails to establish that documents unfavorable to Kmart were deleted as a result of its inadequate preservation efforts.

The court notes that Global cites, *inter alia,* one of the *Zubulake* decisions, *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422 (S.D.N.Y.2004), in support of its contention that the widespread destruction of documents alone will support a finding of prejudice. Any attempt to compare the facts adduced here to those presented in *Zubulake* would be wishful thinking at best. *Zubulake* proved that her employer's personnel were intentionally deleting probative e-mails after they had received at least two explicit preservation directives from counsel. Her extrinsic proof consisted, *inter alia,* of at least forty-five of such deleted e-mails recovered from alternate sources. *Id.* at 429.[15] The court found that the employer had deleted the c-mails "in defiance of explicit instructions not to" and stated that "[b]ecause [the employer's]

---

**15.** Some of the e-mails that the employees had deleted in *Zubulake* were recovered from the active files of other employees who had not previously been asked by counsel to produce their electronic information. Other deleted e-mails were recovered from backup tapes that were restored pursuant to prior decisions in the case. With regard to backup tapes, the court noted in *Zubulake* that generally, a litigation hold need not extend to "inaccessible backup tapes (*e.g.*, those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy," *Zubulake,* 229 F.R.D. at 431 (quoting from court's prior decision in *Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 218 (S.D.N.Y.2003)), The court further noted that

accessible backup tapes i.e., those "actively used for information retrieval," should ordinarily be subject to a litigation hold. *Id.* Finally, the court opined that there should be one exception to this "general rule;" i.e., "[i]f a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of 'key players'... should be preserved if the information contained on those tapes is not otherwise available." *Id.* n. 72. The backup program used by Zubulake's employer created indexes of each backup tape; accordingly, the tapes containing e-mail files of the key players in that case could be identified. *See Zubulake v, UBS Warburg LLC,* 217 F.R.D., 309, 314 (S.D.N.Y.2003).

spoliation was willful, the lost information [was] presumed to be relevant." *Id.* at 436.

Global has not come anywhere near the showing made in *Zubulake*, and indeed, Global's quote from the *Zubulake* opinion (in support of Global's assertion that the widespread destruction of documents alone will support a finding of prejudice) entirely omits the language concerning the willfulness of the destruction in that case.[16] The court, in awarding an adverse inference instruction, stated:

> No one can ever know precisely what was on those tapes, but the content of e-mails recovered from other sources—along with the fact that UBS employees wilfully deleted e-mails—is sufficiently favorable to Zubulake that I am convinced that the contents of the lost tapes would have been similarly, if not more, favorable.

*Id.* at 437, Again, in addition to the finding of willfulness, Zubulake's extrinsic proofs included numerous e-mails that were supportive of her claims. *See, e.g., Zubulake,* 229 F.R.D. at 427–28,

## III.

■■■ Although, for the reasons detailed above, the court finds that Global has failed to establish that sanctions for spoliation of evidence are warranted, the court does not condone the shortcomings in Kmart's document retrieval and production efforts or its fragmentary compliance with the July 11 Order, The efforts made by Kenneth Pocius to retrieve responsive information were woefully insufficient As indicated above, he initially delegated the task of gathering responsive information to a contract attorney and could not recall with certainty where the attorney had looked for electronic information, which employees he may have spoken to, or what he might have said to them. After the production of only sixty-six pages and the voicing of concerns by Global, Pocius took on the in-house "point responsibility" for responding to the discovery requests. Nonetheless, he could recall with certainty speaking only to five employees, and he did not give them any guidance as to where to look for electronic data, because, *inter alia,* he did not know—and presumably took no steps to find out—where they stored their information. Finally, Pocius did not approach the IT department to have them search for electronic information until October of 2005.

It is not clear when IT first provided the CD containing the 1.45 gigabytes of data that resulted from Pocius' request. It is clear, however, that it was not provided to outside counsel, George Mesires, until February of 2006. After a search of the data for responsive information, approximately 456 pages were produced to Global on March 13, 2006—after the instant motion was filed. Moreover, it was not until late March, when Mesires was preparing for the evidentiary hearing in this matter, that he discovered that the CD did not include H-drive information. IT thus did not conduct a search for H-drive information until the week of April 17, 2006, i.e., the week before the evidentiary hearing, and at the time of that hearing, responsive information from the H-drives located by IT had not yet been produced to Global, Finally, as of the time of the hearing, Kmart had not yet adequately searched its P- and W-drives.

---

**16.** Global's citation to *Zubulake* included a parenthetical that merely stated: "(the court determined that contents of destroyed backup tapes would have been favorable to the plaintiff where 'no one can ever know precisely what was on [them]')." Global Response to Kmart Conclusion ¶ 71.

It is clear that some of Kmart's production resulted, at least in part, from Global's efforts—including the filing of the instant motion. Again, the court does not condone Kmart's dilatory and disjointed disclosure and production efforts or its fractional compliance with the July 11 Order. The court does note, however, that Kmart has produced a massive amount of information, the vast majority of which was provided before the instant motion was filed.

While the court believes that an award of attorney's fees and costs is appropriate here, only a portion of those incurred by Global in the drafting, presentation, and trial of its motion will be allowed. The amount of the award will be determined after trial, at the time of the disposition on the merits of this litigation. It would be counterproductive to litigate the amount at this time, and the court will be in a better position in any event to assess the reasonableness of an award at the time of the disposition on the merits.

Moreover, because, *inter alia*, Kmart had not adequately searched all available data repositories as of the time of the hearing in this matter, the denial of Global's request for sanctions for spoliation of evidence will be without prejudice to Global's right to renew its request in the event that additional evidence relevant to the required showing comes to light.

### Conclusion.

For all of the reasons set forth above, Kmart's motion for directed verdict at the close of Global's case, deemed to be a motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c), is denied to the following extent. The court grants in part and denies in part, without prejudice, Global's "Motion for Sanctions for Spoliation and Violation of the Court's July 11, 2005 Order and Motion to Compel Discovery." The court will award some of the attorney's fees and costs incurred by Glob-

al in the drafting, presentation, and trial of its motion, such award to be determined after trial, at the time of the disposition on the merits of this litigation. In addition, Kmart shall, to the extent it has not already done so, perform a systematic search of all documents on its P-drive and W-drive and shall produce them to counsel for Global within fourteen days of the date hereof. In all other respects (other than the request for production of personnel files, which was previously resolved), the motion will be denied without prejudice. This matter will be set for August 21, 2007 at 10:30 a.m. for status and for the setting of a trial date.

This opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. A separate order will be entered pursuant to Bankruptcy Rule 9021.